**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

STEWART ABRAMSON, individually and on
behalf of a class of all persons and entities
similarly situated,

        Plaintiff

vs.

OASIS POWER, LLC d/b/a OASIS ENERGY
and PROTEL MARKETING INC.

        Defendants.

Case No. 2:18-cv-479-LPL

COMPLAINT-CLASS ACTION

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
<u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    Introduction ...................................................................................................... 1

II.   Background ...................................................................................................... 2

III.  Standard ........................................................................................................... 4

    A.    12(b)(1) and Article III Standing ........................................................ 4

    B.    12(b)(6) ................................................................................................ 4

IV.  Argument ......................................................................................................... 5

    A.    Mr. Abramson is Entitled to the Protection of the TCPA ...................... 5

        1.    Mr. Abramson has Established that he Suffered Multiple Concrete Injuries ................................................................................ 12

        2.    Defendant's Calls Invaded Plaintiff's Privacy and Were a Nuisance ........ 13

        3.    Defendant Harmed Plaintiff by Occupying his Cellular Telephone Line ............................................................................ 14

        4.    Mr. Abramson Suffered Tangible Concrete Harm in the Form of Economic Damages from the Use of his Cellular Telephone ................... 14

    B.    Mr. Abramson has Concretely Alleged that an ATDS was Used to Make the March  13 Call with Specific Factual Support ....................................... 15

    C.    Mr. Abramson Did not Provide His Prior Express Written Consent to be Called with an Autodialer for the March 17 Call. ................................. 17

V.    Conclusion ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. CWS Apt. Homes, LLC*,
   No. 16-426, 2016 U.S. Dist. LEXIS 146627 (W.D. Pa. Oct. 24, 2016) .................................10

*ALA, Inc. v. CCAIR, Inc.*,
   29 F.3d 855 (3d Cir. 1994)...........................................................................................16

*Alston v. Countrywide Fin. Corp.*,
   585 F.3d 753 (3rd. Cir. 2009) ........................................................................................4

*American States Ins. Co. v. Capital Assocs.*,
   392 F.3d 939 (7th Cir. 2004) .......................................................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................................5

*Bee, Denning, Inc. v. Capital Alliance Grp.*,
   310 F.R.D. 614 (S.D. Cal. 2015) ...................................................................................1

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................4, 5

*Cabiness v. Educ. Fin. Sols.*,
   No. 16-cv-01109-JST, 2016 WL 5791411 (N.D. Cal. Sept. 1, 2016) ....................................12

*Caudill v. Wells Fargo Home Mtg., Inc.*,
   Civ. No. 5:16–066, 2016 WL 3820195 (E.D. Ky. July 11, 2016) ..........................................13

*Cour v. Life360, Inc.*,
   No. 16-CV-00805-TEH, 2016 WL 4039279 (N.D. Cal. July 28, 2016) ................................12

*Cunningham v. Rapid Response Monitoring Servs.*,
   251 F. Supp. 3d 1187 (M.D. Tenn. 2017)................................................................8, 9, 10, 12

*Evans v. Nat'l Auto Div., L.L.C.*,
   No. 15-8714, 2016 U.S. Dist. LEXIS 123660 (D.N.J. Sept. 12, 2016) ..........................8, 9, 10

*Fini v. DISH Network L.L.C.*,
   955 F. Supp. 2d 1288 (M.D. Fla. 2013)..........................................................................14

*Fitzhenry v. ADT Corp.*,
   No. 14-80180-MIDDLEBROOKS/BRAN, 2014 U.S. Dist. LEXIS 166243
   (S.D. Fla. Nov. 3, 2014).................................................................................................9

*France v. Ditech Fin., LLC*,
   No. 8:17-cv-03038-SCB-MAP, 2018 WL 1695405 (M.D. Fla. Apr. 6, 2018)......................16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)......................................................................................................4

*FTC v. Lifewatch Inc.*,
   176 F. Supp. 3d 757 (N.D. Ill. 2016) ..................................................................11

*Gager v. Dell Fin. Services, LLC*,
   727 F.3d 265 (3d Cir. 2013)...............................................................................5

*Gould Elecs. Inc. v. United States*,
   220 F.3d 169 (3d Cir. 2000)...............................................................................4

*Jones v. Revenue Assistance Corp.*,
   No. 14-10218-GAO, 2016 U.S. Dist. LEXIS 136993 (D. Mass. Aug. 31,
   2016) ..................................................................................................8, 9, 10

*Juarez v. Citibank, N.A.*,
   No. 16-CV-01984-WHO, 2016 WL 4547914 (N.D. Cal. Sept. 1, 2016) ...............12

*Krakauer v. Dish Network L.L.C.*,
   No. 1:14-CV-333, 2016 WL 4272367 (M.D.N.C. Aug. 5, 2016) .........................13

*Lee v. Credit Management*,
   846 F. Supp. 2d 716 (S.D. Tex. 2011) .................................................................15

*Mayer v. Belichick*,
   605 F.3d 223 (3d Cir. 2010).................................................................................16

*Mey v. Got Warranty, Inc.*,
   No. 5:15-CV-101, 2016 WL 3645195 (N.D. W. Va. June 30, 2016)....................14

*Mey v. Venture Data, LLC*,
   245 F. Supp. 3d 771 (N.D. W. Va. 2017) ......................................................9, 10

*Morris v. Unitedhealthcare Ins. Co.*,
   No. 4:15-CV-00638-ALM-CAN, 2016 U.S. Dist. LEXIS 168288 (E.D. Tex.
   Nov. 8, 2016) ....................................................................................................9, 10

*Owens Ins. Co. v. European Auto Works, Inc.*,
   695 F.3d 814 (8th Cir. 2012) ...............................................................................13

*Revell v. Port Auth.*,
   598 F.3d 128 (3d Cir. 2010).................................................................................17

*Reyes v. BCA Fin. Servs., Inc.*,
   --- F. Supp. 3d ---, 2018 WL 2220417 (S.D. Fla. May 14, 2018)..........................................16

*Skinner v. Switzer*,
   562 U.S. 521 (2011)................................................................................................................5

*Soppet v. Enhanced Recovery Co., LLC*,
   679 F.3d 637 (7th Cir. 2012) ...............................................................................................15

*Spokeo v. Robins*,
   136 S.Ct. 1540 (2016)..............................................................................................1, 12, 13, 15

*Stoops v. Wells Fargo Bank, N.A.*,
   2016 U.S. Dist. LEXIS 82380 (W.D. Pa. June 24, 2016)......................................7, 8, 9, 10

*Susinno v. Work Out World Inc.*,
   862 F.3d 346 (3d Cir. 2017).....................................................................................................6

*United States v. Credit Bureau Collection Services*,
   No. 2:10-cv-169 (S.D. Oh. Feb. 24, 2010) ...........................................................................11

*Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*,
   401 F.3d 876 (8th Cir. 2005) ...................................................................................................7

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)......................................................................................................5

*Warnick v. DISH Network, LLC*,
   2014 U.S.Dist. LEXIS 138381 (D. Colo. Sept. 30, 2014)....................................................15

**Regulatory Cases**

*In re Rules and Regulations Implementing the TCPA of 1991*,
   18 FCC Rcd. 14014 (2003)...........................................................................................14, 15

*In re Rules and Regulations Implementing the TCPA of 1991*,
   23 FCC Rcd. 559 (2007)...............................................................................................14, 15

*In re Rules and Regulations Implementing the TCPA of 1991*,
   27 FCC Rcd. 1830 (2012)....................................................................................................14

*In re Rules and Regulations Implementing the TCPA of 1991*,
   30 FCC Rcd. 7961 (July 10, 2015) .......................................................................................2

**Statutes**

47 U.S.C. § 227........................................................................................................... *passim*

47 U.S.C. § 227(a)(1)..............................................................................................................15

47 U.S.C. § 227(b)(1) ..............................................................................................2

47 U.S.C. § 227(b)(1)(A)(iii) ................................................................................1

47 U.S.C. § 227(b)(3) ..............................................................................................2

**Rules**

Fed. R. Civ. P. 8 .......................................................................................................4

Fed. R. Civ. P. 8(a)(2) .............................................................................................4

Fed. R. Civ. P. 12(b)(6) ...........................................................................................4

**Other Authorities**

137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings) ...............................2

FCC Chairman Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016)...............3

*FTC Releases FY 2017 National Do Not Call Registry Data* (Dec. 18, 2017)...............3

New York Times, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging, Tara
Siegel Bernard* (May 6, 2018) ...............................................................3

# I.     INTRODUCTION

Plaintiff Stewart Abramson ("Plaintiff") filed this suit alleging that Oasis Power, LLC d/b/a Oasis Energy ("Oasis Energy") made unwanted, computer-dialed telemarketing calls to his cellular telephone line using an unlawful automatic telephone dialing system ("ATDS" or "autodialer") prohibited by the Telephone Consumer Protection Act ("TCPA"). *See* 47 U.S.C. § 227(b)(1)(A)(iii). The Plaintiff filed this matter as a putative class action lawsuit because "[i]n the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions." *Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015). Through their prior motion, Oasis Energy revealed that their vendor, Protel Marketing, Inc. ("Protel") physically dialed the call[1], and so the Plaintiff filed an Amended Complaint naming Protel. ECF No. 18.

In response to this straightforward claim, Oasis Energy launches an attack on the Plaintiff and asserts that consumers who receive illegal telemarketing calls do not suffer any injury following the United States Supreme Court's decision in *Spokeo v. Robins,* 136 S.Ct. 1540 (2016) if they have previously or frequently litigated TCPA claims. This is an argument that courts have repeatedly rejected in the TCPA context, including the Third Circuit Court of Appeals.

Second, ignoring the Plaintiff's plain allegations that a specific type of ATDS was used to make the first call to his cellular telephone, Oasis Energy offers an affidavit of its own employee about the calling system used by a vendor to contact Mr. Abramson, *despite the fact that Oasis itself did not contact the Plaintiff.* Oasis's self-serving speculation about the nature of the dialing system used by Protel cannot be employed to disregard the concrete allegations by

---

[1] *See* ECF No. 16.

Plaintiff that the call had all of the hallmarks of a call placed via an ATDS. Because Plaintiff has concretely alleged that an ATDS dialing system was used with specific factual support, the motion should be denied. Finally, the Plaintiff did not provide his consent for the second automated call to his cellular telephone, which was also made to solicit the Plaintiff for Oasis Energy services.

## II.   BACKGROUND

Enacted in 1991, the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") provides:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service.

47 U.S.C. § 227(b)(1).

When it passed the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings). Encouraging individuals to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

2

Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years:

- "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7991 at ¶ 1 (July 10, 2015).

- "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." FCC Chairman Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016) (https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls).

- "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016) (https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf ).

- In 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. For every month in the fiscal year, robocalls made up the majority of consumer complaints about Do Not Call violations. *FTC Releases FY 2017 National Do Not Call Registry Data* (December 18, 2017) (https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc).

- Just recently (May 6, 2018) the New York Times reported extensively on the surging number of robocall complaints filed by consumers with the FTC and overall widespread consumer outrage as to the prevalence of illegal telemarketing despite existing law. *See "Yes, It's Bad. Robocalls, and Their Scams, Are Surging." https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html*.

Plaintiff's claim is that Oasis Energy engaged in a telemarketing solicitation program that violated the TCPA by having its vendor Protel use an ATDS to contact him on his cellular telephone on March 13, and March 17, 2018. ECF No. 18 at ¶ 22-25, 27. Oasis Energy did so to try to secure Plaintiff as a customer of its energy services. *Id.* at ¶ 38. Because the call to the Plaintiff was transmitted using technology capable of generating thousands of similar calls per day, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who were sent the same illegal telemarketing call promoting Oasis Energy. ECF No. 18 at ¶ 4.

Unfortunately, Mr. Abramson is not the only individual who has received these solicitations. *Id.*
at ¶ 45-46. As such, the Plaintiff is seeking to represent the following class of individuals:

> All persons within the United States to whom: (a) Defendants' and/or a third party
> acting on their behalf, made one or more non-emergency telephone calls; (b) that
> could have promoted Defendants' products or services; (c) to their cellular
> telephone number; (d) using an automatic telephone dialing system or an artificial
> or prerecorded voice; and (e) at any time in the period that begins four years before
> the date of the filing of this Complaint to trial.

ECF No. 18 at ¶ 74.

## III.    STANDARD

### A.    12(b)(1) and Article III Standing

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered

an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). An injury-in-fact is "an invasion of

a legally protected interest" that is "concrete and particularized." *Alston v. Countrywide Fin.*

*Corp.*, 585 F.3d 753, 762-63 (3rd. Cir. 2009) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992). "[T]he court must only consider the allegations of the complaint and documents

referenced therein and attached thereto, in the light most favorable to Plaintiff." *Gould Elecs.*

*Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

### B.    12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8

of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim

showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the

defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation, alteration and internal quotation marks omitted), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.*

To survive a motion to dismiss, the plaintiff's complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (citation and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

## IV.    ARGUMENT

### A.    Mr. Abramson is Entitled to the Protection of the TCPA

Congress passed the TCPA to protect consumers, like Plaintiff, from unwanted telephone calls. *See Gager v. Dell Financial Services, LLC*, 727 F.3d 265, 268 (3d Cir. 2013) (citing *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012)). This action was brought by the recipient of an unsolicited, automated call to enforce a statute designed to protect recipients of unsolicited, automated calls. Wholly ignoring binding Third Circuit precedent, Oasis Energy asserts that Mr. Abramson did not suffer any concrete injuries, depriving him of Article III standing because he has previously filed cases to vindicate his rights for illegal telemarketing calls, and because he investigated the source of the illegal calls he received. Just last year, the Third Circuit Court of

Appeals rejected the notion that a TCPA violation did not constitute an injury-in-fact under the

*Spokeo* standard:

> [W]e conclude that the injuries alleged by Susinno are concrete for two reasons. First, Congress squarely identified this injury. The TCPA addresses itself directly to single prerecorded calls from cell phones, and states that its prohibition acts "in the interest of [ ] privacy rights." 47 U.S.C. § 227(b)(2)(C). The congressional findings in support of the TCPA likewise refer to complaints that "automated or prerecorded telephone calls are a nuisance [and] . . . an invasion of privacy." Pub. L. 102-243, § 2. We therefore agree with Susinno that in asserting "nuisance and invasion of privacy" resulting from a single prerecorded telephone call, her complaint asserts "the very harm that Congress sought to prevent," arising from prototypical conduct proscribed by the TCPA. App. 11 (First Amended Complaint); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding two unwanted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect")…
>
> Traditionally, a plaintiff's "privacy is invaded" for the purpose of an intrusion upon seclusion claim by telephone calls "only when [such] calls are repeated with such persistence and frequency as to amount to . . . hounding." Intrusion upon Seclusion, Restatement (Second) of Torts § 652B, cmt d (1977). The Second Restatement suggests that because "two or three" calls would not be "highly offensive to the ordinary reasonable [person]," they traditionally would provide no cause of action. *Id.* Yet when Congress found that "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients," *Van Patten*, 847 F.3d at 1043, it sought to protect the same interests implicated in the traditional common law cause of action. Put differently, Congress was not inventing a new theory of injury when it enacted the TCPA. Rather, it elevated a harm that, while "previously inadequate in law," was of the same character of previously existing "legally cognizable injuries." *Spokeo*, 136 S. Ct. at 1549. *Spokeo* addressed, and approved, such a choice by Congress.
>
> For these reasons, we hold that Susinno has alleged a concrete, albeit intangible, harm under the Supreme Court's decision in *Spokeo*

*Susinno v. Work Out World Inc.,* 862 F.3d 346, 351-52 (3d Cir. 2017). *Susinno* compels the same

result here. Ignoring *Sussino*, which makes no appearance in the Defendant's brief, and the plain

language of the statute, Oasis Energy posits a unique theory of standing. It apparently has no

objection to the standing of individuals who cannot be put to the trouble of suing them, but those

like Mr. Abramson, who have a track record of investing time and energy to enforce federal

telemarketing law should be stripped of the TCPA's protections.

On what evidence, other than its own speculation and apparent resentment for being sued by Mr. Abramson, does Oasis Energy base the assertion that Mr. Abramson wanted to be called? That Mr. Abramson has filed lawsuits to *stop* illegal telemarketing calls and has had courts award him default judgments against companies that don't appear to defend themselves. Mr. Abramson's activities as a consumer advocate empowered by the congressionally-conferred private right of action to enforce the TCPA supports one conclusion: that Mr. Abramson, a private citizen motivated to fight back against illegal telemarketers, is exactly the sort of plaintiff Congress intended the TCPA to protect, and fits squarely within the TCPA. Rather, by actively holding defendants to account for their illegal acts via the private right of action afforded to consumers by Congress, Mr. Abramson is doing ***exactly*** what Congress intended—he is enforcing the law. *See Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 881 (8th Cir. 2005) (recognizing that fixed award liquidated damages under the TCPA demonstrate the intent to incentivize aggrieved parties to act as "private attorneys general").

Oasis Energy's support for its position comes from *Stoops v. Wells Fargo Bank, N.A.*, 2016 U.S. Dist. LEXIS 82380 (W.D. Pa. June 24, 2016). However, a glaring factual distinction between that case and this matter is that the plaintiff in *Stoops* conceded that she purchased cell phones for the *sole purpose* of manufacturing TCPA claims. *See Id.* at *32 ("Q. Does anyone you know ever call you at these phone numbers? A. No, ma'am. Q. Did you ever use any of these phone numbers to call anyone? A. No, ma'am…Q. How did you use this phone number after it was activated, if at all? A. For my business. Q. Okay. When you say for your business, what do you mean? A. Suing clients like yours, Wells Fargo, for violating the TCPA.")

Here, there is no such evidence that Mr. Abramson purchases or uses telephones for the sole purpose of bringing lawsuits under the TCPA. There's a good reason for that, it's not true, as he's had that phone number for *28 years*. *See* <u>Exhibit 1</u>, Affidavit of Stewart Abramson at ¶ 3-4. The fact of the matter is that Mr. Abramson does not collect telephones like the plaintiff in *Stoops* in order to manufacture TCPA litigation like Oasis Energy implies, but instead fights back when companies illegally contact him.

Federal courts have been skeptical of defendants attempting to paint TCPA cases with a broad brush invoking *Stoops*. As one explained:

> The statutory damages available under the TCPA are, in fact, specifically designed to appeal to plaintiffs' self-interest and to direct that self-interest toward the public good: "like statutory compensation for whistleblowers," they "operate as bounties, increasing the incentives for private enforcement of law." <u>Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.</u>, 747 F.3d 489, 492 (7th Cir. 2014). Designing a cause of action with the purpose of enlisting the public in a law's enforcement scheme is a well-established tool that can be found in areas ranging from antitrust and civil rights law to environmental law and false claims. While these schemes do not eliminate the constitutional requirement of an injury-in-fact, neither do they impose an additional hurdle simply because the plaintiff may have a motive beyond mere compensation for his injury.
>
> The determinative issue, then, is not Cunningham's motivations, but whether he was injured. An ordinary consumer who pled the facts that Cunningham has pled would have established a concrete and particularized injury-in-fact based on the Defendants' intrusion upon his rights to privacy and seclusion. (<u>See</u> Doc. No. 57 at ¶ 78 (stating that Defendants infringed on Cunningham's "right to be left alone")). Defendants suggest that, by becoming a so-called "professional plaintiff," he has forfeited those rights because the calls alleged were not truly unwanted. Insofar as <u>Stoops</u> endorses such a result, this Court disagrees. It may be that Cunningham was not saddened or annoyed by the calls he received; it may even be that, knowing his rights under the TCPA, he is glad the calls were placed. But allowing that fact, even if true, to negate his right to privacy and seclusion would require the Court to embrace a line of reasoning that would ultimately undermine the rights of most, if not all, TCPA plaintiffs and plaintiffs in similar statutory schemes.

*Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1195-96 (M.D. Tenn. 2017). *See also Jones v. Revenue Assistance Corp.*, No. 14-10218-GAO, 2016 U.S. Dist. LEXIS

136993, at *16-17 (D. Mass. Aug. 31, 2016) ("Although Defendant argues that Plaintiff's only source of income since 2012 has been lawsuits, unlike the plaintiff in Stoops, Jones has not admitted that he "files TCPA actions as a business.""); *Evans v. Nat'l Auto Div., L.L.C.*, No. 15-8714, 2016 U.S. Dist. LEXIS 123660, at *8 (D.N.J. Sept. 12, 2016) ("As a consumer complaining of receiving intrusive telemarketing calls, Plaintiff falls directly within the zone of interests protected by the TCPA… *Stoops* is distinguishable from this case on the grounds that the plaintiff in that case acknowledged that she only purchased cell phones in order to file TCPA lawsuits."); *Mey v. Venture Data, LLC,* 245 F. Supp. 3d 771 (N.D. W. Va. 2017) ("This Court declines to follow *Stoops*. This plaintiff did not try to receive calls from other states. She secured equipment to document calls that came to her home. While POS is understandably frustrated by Ms. Mey's efficacy, she is doing exactly what Congress intended —enforcing the law.").

The *Stoops* decision was likewise distinguished by the district court in *Morris v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-00638-ALM-CAN, 2016 U.S. Dist. LEXIS 168288, at *17 (E.D. Tex. Nov. 8, 2016), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 168118, at *1 (E.D. Tex. Dec. 6, 2016). George Morris allegedly (1) filed at least thirty-six lawsuits under the TCPA; (2) considered "franchising" his TCPA lawsuits; (3) taught classes teaching others how to sue telemarketers; and (4) "listed himself as a Pro Se Litigant of TCPA lawsuits on his LinkedIn profile." *Id.* at *15. None of these facts led the court the conclude that Mr. Morris fell outside the TCPA's zone of interests because the defendant "proffered no evidence that 972-943-9799 is a residential telephone number Plaintiff maintains purely for the purpose of filing TCPA lawsuits."

The *Cunningham, Jones, Evans, Mey* and *Morris* cases fall squarely in line with the district court's holding in *Fitzhenry v. ADT Corp.*, No. 14-80180-MIDDLEBROOKS/BRAN,

2014 U.S. Dist. LEXIS 166243 (S.D. Fla. Nov. 3, 2014). In that action, the plaintiff's wife testified that he had begun pursuing TCPA claims as "an opportunity to bring in more income." *Id.* at *11. His daughter testified that he "had several different phone numbers at his home to get a higher volume of telemarketing calls." *Id.* at *12 (alteration marks omitted). The defendant argued that, because Mr. Fitzhenry welcomes telemarketing calls to support his TCPA business, he is not in the TCPA's zone of protection. *Id.* The court rejected that argument *Id.*

Like the defendants in *Cunningham, Jones, Evans, Mey* and *Morris*, and unlike the defendant in *Stoops*, Oasis has failed to show that Plaintiff purchased phone numbers—let alone the phone number they robocalled—for the sole purpose of cultivating TCPA claims. For good reason: he didn't. *See* Exhibit 1 at ¶ 4.

In fact, this is not the first TCPA defendant in this District to claim that Mr. Abramson should have no recourse for automated calls to his cellular telephone. Oasis Energy's argument is identical to one made in *Abramson v. CWS Apt. Homes, LLC*, No. 16-426, 2016 U.S. Dist. LEXIS 146627 (W.D. Pa. Oct. 24, 2016), where Mr. Abramson also filed a putative class action under the TCPA for a single automated telemarketing call. In denying the motion to dismiss, the Court found:

> Abramson suffered a concrete harm analogous to the common law tort of invasion of privacy. Congress has determined unrestricted telemarketing "can be an intrusive invasion of privacy." In line with Congress' finding, courts hold "a plaintiff demonstrates a violation of privacy interests, and therefore an injury-in-fact, after receiving automated calls" in violation of the Act. Abramson alleges CWS sent him the offending text message despite his lack of consent to receive telemarketing and his lack of business dealings with CWS. Abramson also claims he never provided CWS with his cell phone number. These facts adequately demonstrate Abramson suffered a concrete injury akin to a violation of his privacy interests.

> We reject CWS's argument Abramson's pursuit of his rights under the Act in other lawsuits demonstrates the lack of an injury. As Abramson adequately pleads a concrete and particularized injury, he satisfies Article Ill's standing requirements.

> Abramson's decision to enforce his rights under the Act does not negate the existence of a cognizable injury.

*Id.* at *6-7 The facts in this current case are the same for Mr. Abramson; he received an automated solicitation call despite never doing business with Oasis, and then he investigated the illegal call. Oasis Energy relegates this decision to a footnote, attempting to distinguish this matter by asserting that Mr. Abramson "played along" with the Oasis call, which, as explained below was necessary to identify Oasis Energy, since its vendor did not identify who it was calling for and it called using a Caller ID number that was not working. In other words, there was no way to identify the calling party other than listening to the sales pitch.

Oasis Energy also claims that Mr. Abramson "played along" with Oasis Energy for the "purpose of identifying a defendant and engineering this lawsuit". ECF No. 24 at 8. The reality is that Oasis Energy's vendor, Protel Marketing, did not identify itself or Oasis Energy during the automated calls and Mr. Abramson investigated the call long enough to verify who was calling. *See* ECF No. 18 at ¶¶ 33-35, 37. Furthermore, Protel Marketing called from a non-working Caller ID number, 330-892-7061. *Id.* at ¶ 28. There is nothing wrong with a consumer advocate posing as an interested customer in order to enforce federal law. The Federal Trade Commission, which is charged with enforcement of federal telemarketing laws, regularly has investigators pose as potential customers, and this Court has endorsed that approach. *See e.g.* Consent Decree, *United States v. Credit Bureau Collection Services*, No. 2:10-cv-169, Doc. No. 3, § X (S.D. Oh. Feb. 24, 2010) (authorizing FTC to use "lawful means," including "posing as consumers and suppliers" in order to monitor and investigate compliance with federal law). TCPA plaintiffs are permitted to engage in the same conduct:

> Cognizant of how damaging Mey's evidence is, Defendants disparage her as a "professional litigant" who "earns her living by selling things on eBay and by being a plaintiff in class action TCPA lawsuits." 12/14/15 Tr. at 41. (They neglect to mention that she is also supported by her spouse. Doc. 100-3 at 5-6.) According to

Defendants, Mey's statements should be ignored because she often misrepresented to telemarketers that the name "Lifewatch" appeared on her caller identification in order to elicit their connection to Lifewatch. Doc. 100 at 16. But the telemarketers' admissions are not rendered invalid just because Mey (successfully) tricked them into (truthfully) revealing that they sold products for Lifewatch.

*FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 771 (N.D. Ill. 2016). Private TCPA lawsuits are not treated any differently – posing as an interested consumer is an approach endorsed by Courts in order to ascertain the identity of the calling party and hold them responsible:

> The calls show that Cunningham appears to have been very good at eliciting information from the callers that he could later use in this lawsuit, which the RRMS Defendants suggest demonstrates that he was cultivating a TCPA claim. Cunningham's Second Amended Complaint, though, **openly admits that the reason he eventually accepted one of the calls was 'to ascertain the identity of the party placing' them, and Cunningham has explained his sleuthing in significant detail himself. (Doc. No. 57 at ¶ 13.) His later pleadings are entirely straightforward that he was in fact cultivating a claim. (Doc. No. 85 at 10 ('The only reason why the Plaintiff faked interest in the calls was to identify the seller of goods/services that was behind the calls.'))… [i]t is safe to say that, when the telemarketers in this case called a phone belonging to Cunningham, they— presumably unwittingly—found themselves in the sights not of an ordinary hapless consumer, but a seasoned plaintiff, likely primed and ready to take them to court if their actions violated the TCPA. Nothing in the Constitution, though, requires a plaintiff to be a naïf.**

*Cunningham* at 1194-95 (M.D. Tenn. 2017) (emphasis added). When Oasis Energy's vendor called Mr. Abramson without identifying itself or Oasis Energy, they found themselves in the hands not of an unwitting consumer but someone ready and willing to take them to task for violating the TCPA.

### 1.    Mr. Abramson has Established that he Suffered Multiple Concrete Injuries

In *Spokeo*, the Supreme Court confirmed that a plaintiff must plead a concrete and particularized injury but clarified that an "intangible" injury is sufficient to confer Article III standing. Since *Spokeo,* district courts have repeatedly held that plaintiffs who allege under the TCPA that automated or prerecorded telephone calls to invade their privacy or are a nuisance, or

who complain that the calls have occupied their phone lines preventing legitimate communications, have established Article III standing.[2] As explained below, Plaintiff suffered at least three concrete injuries that have been recognized under the common law, or by Congress: (1) invasion of privacy and a nuisance; (2) occupation of Plaintiff's cellular telephone; and (3) economic harm from the use of his cell phone. Each injury alone is sufficient in and of itself to establish Article III standing.

### 2. Defendant's Calls Invaded Plaintiff's Privacy and Were a Nuisance

Nuisance and invasion of privacy are the precise harms that Congress sought to prevent in enacting the TCPA. Here, the Plaintiff has alleged that he and putative class members suffered particularized and concrete injuries because the calls at issue were a nuisance, forced class members to incur expenses, and violated class members' privacy rights—the exact harms that Congress sought to prevent in enacting the TCPA. *See* 47 U.S.C. § 227 (Congressional Findings); *see also Owens Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 819-20 (8th Cir. 2012) ("[T]he ordinary meaning of the term 'right of privacy' easily includes violations of the type of privacy interest protected by the TCPA."). Mr. Abramson filed this lawsuit to combat the

---

[2] *See Cabiness v. Educ. Fin. Sols.*, No. 16-cv-01109-JST, 2016 WL 5791411 (N.D. Cal. Sept. 1, 2016) (a TCPA violation "necessarily harms the recipient of the unwanted calls such that the statutory violation is sufficient on its own to constitute an injury in fact"); *Cour v. Life360, Inc.*, No. 16-CV-00805-TEH, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (rejecting Life360's argument that invasion of privacy is insufficient to confer Article III standing); *Juarez v. Citibank, N.A.*, No. 16-CV-01984-WHO, 2016 WL 4547914, at *3 (N.D. Cal. Sept. 1, 2016) ("Juarez's allegation that he received repeated unwanted calls that caused him aggravation, nuisance, and an invasion of privacy, is sufficient to allege a 'concrete' and 'particularized' injury that establishes standing under *Spokeo*."); *Krakauer v. Dish Network L.L.C.*, No. 1:14-CV-333, 2016 WL 4272367, at *2 (M.D.N.C. Aug. 5, 2016) ("While class members did not necessarily pick up or hear ringing every call at issue in this case, each call created, at a minimum, a risk of an invasion of a class member's privacy" for purposes of Article III standing); *Caudill v. Wells Fargo Home Mtg., Inc.*, Civ. No. 5:16–066, 2016 WL 3820195, at *2 (E.D. Ky. July 11, 2016) (noting that calls caused harms "such as the invasion of privacy [that] have traditionally been regarded as providing a basis for a lawsuit in the United States").

proliferation of intrusive, nuisance telemarketing practices violative of class members' privacy rights. *See* ECF No. 18 at ¶¶ 1, 2, 13. Because these harms are the very harm that Congress sought to prevent in enacting the TCPA, they are sufficiently "concrete" to satisfy Article III injury in fact standing as articulated in *Spokeo*.

### 3.   Defendant Harmed Plaintiff by Occupying his Cellular Telephone Line

One purpose of the TCPA is to "keep[] telephone lines from being tied up." *American States Ins. Co. v. Capital Assocs.*, 392 F.3d 939, 942 (7th Cir. 2004). Just as the privacy interests identified in the TCPA are grounded in the common law tort of invasion of privacy, the harm caused by unwanted robocalls to cell phones has a close relationship to the harm recognized by the ancient common law tort "trespass to chattels." *Mey v. Got Warranty, Inc*., No. 5:15-CV-101, 2016 WL 3645195, at *6 (N.D. W. Va. June 30, 2016). In *Got Warranty*, the court found trespass to chattels to be "a close analog for a TCPA violation" and held that the defendant's occupation of the plaintiff's telephone line was a concrete injury sufficient to establish Article III standing for the plaintiff's TCPA claim. 2016 WL 3645195, at *6. The Court in *Got Warranty* denied the defendant's motion to dismiss for lack of standing, explaining that "the TCPA can be viewed as merely applying this common law tort to a 21st-century form of personal property and a 21st-century method of intrusion." *Id.* This Court should reach the same result here. As in *Got Warranty*, Plaintiff received illegal automated telemarketing on his cellphone, which occupied the lines, and prevented Plaintiff from engaging in legitimate communications. *See* ECF No. 18 at ¶ 51.

### 4.   Mr. Abramson Suffered Tangible Concrete Harm in the Form of Economic Damages from the Use of his Cellular Telephone

Finally, Mr. Abramson also sustained economic harm as a direct result of Oasis Energy's illegal telemarketing practices. The calls at issue were received on a cell phone used by and paid

for by Mr. Abramson. The FCC has long recognized that the recipient of telemarketing calls to a cell phone is "charged" for such calls, even if the cell phone subscribes to a plan that charges a flat monthly rate. *See In re Rules and Regulations Implementing the TCPA of 1991,* 18 FCC Rcd. 14014, 14115 (2003); *In re Rules and Regulations Implementing the TCPA of 1991*, 23 FCC Rcd. 559, 562 (2007); *In re Rules and Regulations Implementing the TCPA of 1991*, 27 FCC Rcd. 1830, 1839–40 (2012); *Fini v. DISH Network L.L.C.*, 955 F. Supp. 2d 1288, 1297 (M.D. Fla. 2013*); Lee v. Credit Management*, 846 F. Supp. 2d 716, 729 (S.D. Tex. 2011). As Mr. Abramson paid for his monthly cell phone on which he received the telemarketing calls at issue. *See* Exhibit 1 at ¶ 6. As a result, Mr. Abramson has alleged a tangible injury in fact sufficient to satisfy Article III's standing requirement. *See Warnick v. DISH Network, LLC,* 2014 U.S.Dist. LEXIS 138381 * 43-46 (D. Colo. Sept. 30, 2014) (rejecting argument that because plaintiff did not have a pay per call plan he did not suffer any injury as a result of the calls at issue); *Soppet v. Enhanced Recovery Co.*, *LLC*, 679 F.3d 637, 638 (7th Cir. 2012) (consumers ultimately bear the costs of calls to violative calls to cell phones regardless of "whether they pay in advance or after the minutes are used"). This "tangible" harm is sufficient to confer standing under *Spokeo*.

**B.    Mr. Abramson has Concretely Alleged that an ATDS was Used to Make the March 13 Call with Specific Factual Support.**

The TCPA defines an ATDS as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See* 47 U.S.C. § 227(a)(1) (emphasis added). The FCC, the agency charged with interpreting and administering the TCPA, has repeatedly held that a system qualifies as an ATDS if it is a predictive dialer. *See In re Rules & Regulations Implementing the TCPA,* 18 FCC Rcd. 14014 (2003); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 (2008).

The Plaintiff has alleged that a predictive dialer was used to call him as part of Oasis Energy's solicitation campaign. ECF No. 18 at ¶ 25. Furthermore, the Plaintiff doesn't just rely on the statement that a predictive dialer was used, he explained that the "March 13 telemarketing call began with a distinctive pause after the Plaintiff answered and gave his greeting." *Id.* at ¶ 31. The Plaintiff further alleged, "The dialing technology that causes a distinctive click and/or pause is also known as a predictive dialer, in which lines are dialed using an algorithm to "predict" when a call center operator will be available—which leads to the pause and "click" as the operator takes the call." *Id.* at ¶ 43. Recent courts have confirmed that a predictive dialer is an ATDS. *See France v. Ditech Fin., LLC*, No. 8:17-cv-03038-SCB-MAP, 2018 WL 1695405, at *8 (M.D. Fla. Apr. 6, 2018) (denying a motion to dismiss as a predictive dialer makes calls "from a list of numbers fed into the device"); *Reyes v. BCA Fin. Servs., Inc.*, --- F. Supp. 3d ---, 2018 WL 2220417, at *11-12 (S.D. Fla. May 14, 2018) (denying motion to dismiss as a predictive dialer remains an ATDS).

The Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). Despite this black letter law, Oasis Energy submits an affidavit where an employee claims that he has "determined that the alleged calls were not made using an automatic telephone dialing system." *See* ECF No. 24-1 at ¶ 5. Again, Oasis Energy didn't make the calls, its vendor Protel did. Despite this undisputed fact, Oasis Energy doesn't have an affidavit from Protel identifying the dialing system it used or making the same conclusory statement. Instead, the basis for Oasis Energy's

legal conclusion is that it has somehow obtained a recording of the alleged call that includes a scripted telemarketing pitch that says "I'm sorry I missed your call". First, Mr. Abramson's complaint *plainly denies* making any such call. ECF No. 18 at ¶ 35. As the unauthenticated hearsay statement Oasis offers from Protel provides the basis for Oasis Energy's position, and it is disputed by Mr. Abramson, this is enough to deny the motion.

It's unclear to Mr. Abramson why the telemarketer claimed to be returning a call he did not make, but it's not the first time a telemarketer has done that. Mr. Abramson has received both recorded messages and live calls where a telemarketer will claim that they are returning a missed call that did not occur. *See* Exhibit 1 at ¶ 7. A telemarketer may employ this tactic to try to ensure that a call recipient will stay on the line and not hang up in response to an unprompted telemarketing call. In any event, the motion should be denied, both because Mr. Abramson has plainly denied that this initial call from him occurred and because the Court must also accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). Here, a reasonable inference would be that a telemarketer would be using a scripted line to try and keep the call recipient interested in their sales pitch, consistent with Mr. Abramson's prior experience.

## C.    Mr. Abramson Did not Provide His Prior Express Written Consent to be Called with an Autodialer for the March 17 Call.

The Plaintiff alleges that he received two autodialed telemarketing calls for Oasis Energy, one each on March 13 and March 17. ECF No. 18 at ¶ 27. Oasis ignores the Plaintiff's allegations about the March 13 call and has had its own employee, who was not involved in the call of its vendor, speculate to arrive at the legal conclusion that an ATDS was not used to make the call, as discussed above. Oasis claims not to have the same information about the March 17

17

call, instead claiming that Mr. Abramson provided his consent during the March 13 call during

his investigation into Oasis's vendor's original automated call. However, providing a telephone

number in connection with this investigation does not equate to "prior express written consent"

for future telemarketing solicitations, which is what the TCPA requires. As such, even if Mr.

Abramson had not sufficiently alleged use of an ATDS in the March 13 call, which he has, this

matter would continue regarding his March 17 call.

  "Prior express consent is an affirmative defense to TCPA claims where the calls were

made with the 'prior express consent' of the called party." *Daubert v. NRA Grp., LLC*, U.S. Dist.

LEXIS 94366, at *25-26 (M.D. Pa. July 20, 2016) *quoting* 47 U.S.C. § 227(b)(1)(A). For

telemarketing calls made after October 16, 2013, like the ones alleged here, the FCC defined the

term "prior express written consent" as follows:

> The term prior express written consent means an agreement, *in writing, bearing the*
> *signature of the person called* that *clearly authorizes* the seller to deliver or cause
> to be delivered to the person called advertisements or telemarketing messages using
> an automatic telephone dialing system or an artificial or prerecorded voice, and the
> telephone number to which the signatory authorizes such advertisements or
> telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(8) (emphasis added). The Plaintiff's complaint does not reference such a

writing and, even though it goes outside the four corners of the Plaintiff's complaint, Oasis does

not claim one exists. Any prior express written consent analysis should end there.

  However, even if there was such a writing, the FCC has also provided guidance regarding

consent for entities to use an autodialer to call cellular telephones, as is alleged here, when the

phone number was released in the context of a prior transaction:

> Consumers who provide a wireless phone number for a limited purpose—for
> service calls only, for example—'do not necessarily expect to receive telemarketing
> calls that go beyond the limited purpose,' and thus have not given their consent to
> receive telemarketing calls.

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1840, ¶ 25 (2012);*see also Van Patten v. Vertical Fitness Grp., Ltd. Liab. Co.*, 847 F.3d 1037, 1046 (9th Cir. 2017) ("We conclude that the FCC has established no rule that a consumer who gives a phone number to a company has consented to be contacted for any reason. Instead, FCC orders and rulings show that the transactional context matters in determining the scope of a consumer's consent to contact."); *Blow v. Bijora, Inc.*, 855 F.3d 783, 804-05 (7th Cir. 2017) quoting *Toney v. Quality Res., Inc*., 75 F. Supp. 3d 727, 737 (N.D. Ill. Dec. 1, 2014) ("'Consent for one purpose does not equate to consent for all purposes.') We agree, and do not hold as much here."). *Edeh v. Midland Credit Mgmt., Inc.,* 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010) aff'd, 413 F. App'x 925 (8th Cir. 2011) ("Prior express consent" means that a caller is "not permitted to make an automated call to [an individual's] cell phone unless [that individual] had previously said to [the caller]…something like…:'I give you permission to use an automatic telephone dialing system to call my cellular phone.").

Mr. Abramson provided his cellular telephone number in connection with identifying Oasis energy's services as the company being offered on the illegal call he received. Had Mr. Abramson received a call on March 17 about that transaction, he would have arguably provided his consent to be contacted *about that transaction.*  The Plaintiff's plain allegation, however, is that the March 17 call was a telemarketing solicitation call, and not one following up on his prior call. ECF No. 18 at ¶¶ 25-27, 42 (discussing the "March 17 telemarketing call"), 45 (discussing other complaints of individuals who received telemarketing calls on March 17 from the same Caller ID number that the Plaintiff did). Notably, the affidavit by Oasis attempts to insinuate that this was what the March 17 call was about but admits that it has no information about this call. ECF No. 24-1 at ¶ 14. Frankly, it would follow to reason that if Oasis was following up about the

investigation of Mr. Abramson, it would have records of this call to its potential customer, but it

doesn't.  In a similar case deciding that providing a cellular telephone number for identification

purposes to Walgreens was not consent to receive telemarketing calls from Walgreens, *Kolinek*

*v. Walgreen Co.*, 2014 U.S. Dist. LEXIS 91554 held (N.D. Ill. July 7, 2014) held:

> In retrospect, the Court should have taken from the 2012 Order an indication that the FCC considers the scope of a consumer's consent to receive calls to be dependent on the context in which it is given—contrary to what the Court had seen in the 1992 Order as a general rule that consent for one purpose means consent for all purposes. Any doubt in this regard is removed by the GroupMe Order, issued after the Court's February 2014 ruling. In that order, the FCC took the opportunity to "further clarify" the boundaries of prior express consent under the TCPA. *GroupMe Order*, 29 FCC Rcd 3442, 2013 WL 1266074, at *5 ¶ 12. The FCC said that a consumer gives "prior express consent" when she provides her wireless number to the private organizer of a text message group "agree[ing] to receive associated calls and texts." This, the FCC said, gives the business entity providing the private group messaging service the consumer's consent to receive certain administrative texts and calls related to the operation of the private messaging group as well as the private group members' texts. *Id.* The FCC went on to state that the "prior express consent requirement is satisfied with respect to both GroupMe and the group members regarding that particular group, *but only regarding that particular group.*" *Id.* (emphasis added). By that last clause, the FCC made it clear that turning over one's wireless number for the purpose of joining one particular private messaging group did not amount to consent for communications relating to something other than that particular group.
>
> When one reads the cited FCC orders together, it is clear that the Court erred in its February 2014 ruling in this case. The FCC has established no general rule that if a consumer gives his cellular phone number to a business, he has in effect given permission to be called at that number for any reason at all, absent instructions to the contrary. Rather, to the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on its context and the purpose for which it is given. Consent for one purpose does not equate to consent for all purposes.
>
> This, in the Court's view, is a more natural reading of the TCPA's exception for a call "made with the prior consent of the called party."

*Id.* at *10-11. Oasis Energy's speculation about the purpose of the March 17 call is misplaced in

a motion to dismiss where all of the Plaintiff's allegations are taken as true. This is especially

true when one considers that "[t]he TCPA is a remedial statute that was passed to protect

20

consumers from unwanted automated telephone calls. Because the TCPA is a remedial statute, it should be construed to benefit consumers." *Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013).

## V.   CONCLUSION

For the foregoing reasons, Oasis Energy's motion should both be denied.

Dated: June 21, 2018

> Plaintiff,
> By Counsel,
>
> By:  _/s/ Anthony Paronich_____
>     Anthony Paronich
>     Email: anthony@broderick-law.com
>     BRODERICK & PARONICH, P.C.
>     99 High Street, Suite 304
>     Boston, MA 02110
>     Telephone: (508) 221-1510
>     *Pro Hac Vice*
>
>     Clayton S. Morrow
>     Email: csm@consumerlaw365.com
>     Morrow & Artim, PC
>     304 Ross Street, 7th Floor
>     Pittsburgh, PA 15219
>     Telephone: (412) 281-1250

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2018, I filed the foregoing with the Clerk of Court, which will automatically send notification of such filing to all attorneys of record by placing the same on the Court's electronic docket.

>  _/s/ Anthony Paronich_____
> Anthony Paronich